**INTERIM HEALTHCARE OF FORT WAYNE, INC., Appellant– Defendant,**

v.

**Kimberly MOYER, by her next friend, Karen MOYER and Edward Moyer, and Karen Moyer and Edward Moyer, Individually, Appellees–Plaintiffs.**

No. 02A04–0010–CV–420.

Court of Appeals of Indiana.

April 30, 2001.

Rehearing Denied June 20, 2001.

Edward L. Murphy, Jr., Heidi K. Ellison, Miller Carson Boxberger & Murphy, LLP, Fort Wayne, IN, Attorneys for Appellant.

John B. Powell, Nathan S.J. Williams, Shambaugh, Kast, Beck & Williams, LLP, Fort Wayne, IN, Attorneys for Appellees.

## OPINION

BROOK, Judge

### Case Summary

Appellant-defendant Interim Healthcare of Fort Wayne, Inc. ("Interim") appeals the trial court's denial of Interim's motions for summary judgment against appellees-plaintiffs Kimberly Moyer ("Kimberly"), by her next friend, Karen Moyer ("Karen") and Edward Moyer ("Edward") (collectively, "the Moyers") and Karen and Edward individually. We affirm.

### Issues

Interim raises three issues for review, which we reorder and restate as follows:

I. whether the trial court erred in denying Interim's motion for summary judgment on the Moyers' claim of respondeat superior;

II. whether the trial court erred in denying Interim's motion for summary judgment on the issue of a non-delegable duty; and

III. whether the trial court erred in denying Interim's motion for summary judgment on the Moyers' claim for negligent hiring and retention.

### Facts and Procedural History

The facts most favorable to the Moyers as the non-moving party indicate that Michelle Baral ("Baral") completed an application for employment as a home health aide with Interim on August 1, 1995. Interim requested written references and conducted a criminal background inquiry with the Indiana State Police. Baral's two references were positive, and the background inquiry revealed no prior criminal history. Baral also passed a required series of written and skills tests. Interim hired Baral as a home health aide on August 16, 1995.

Kimberly is mute, severely retarded, and suffers from cerebral palsy. Karen and Edward had contracted with Interim to provide home health care services to fourteen-year-old Kimberly, including feeding, changing, bathing, dressing, and performing range-of-motion exercises. When Kimberly's regular home health aide was on vacation, Interim assigned Baral to care for Kimberly on August 26, 1995, September 2, 1995, and September 9, 1995. During these Saturday visits, Baral would arrive at the Moyers' home at approximately 8:00 a.m. and depart at approximately 3:00 p.m., during which time Karen slept upstairs. Baral was neither expected nor authorized to administer medication to Kimberly. After Baral left the Moyers' home on September 9, 1995, Kimberly suffered a seizure caused by injection of a large insulin dose. Kimberly did not take insulin, but Baral had been an insulin-dependent diabetic since approximately 1992.

On September 5, 1997, the Moyers filed suit against Interim and Baral, alleging negligence; intentional battery; negligent hiring, retention, and training; and fraudulent representation. On June 30, 1999, Interim filed a motion for summary judgment. The Moyers responded on October 1, 1999, and moved to amend their complaint to add a theory of non-delegable duty. Interim filed a reply memorandum in support of its motion on November 5, 1999. On December 16, 1999, the trial court summarily denied Interim's motion for summary judgment and granted the Moyers' motion to amend their complaint, which they filed on January 6, 2000. Interim filed a second motion for summary judgment on March 31, 2000, to which the Moyers responded on June 1, 2000. The trial court summarily denied Interim's second summary judgment motion on June 12, 2000, and certified Interim's subsequent petition for interlocutory appeal on September 20, 2000. This court granted Interim's petition on October 26, 2000.

### Discussion and Decision

#### *Standard of Review*

Summary judgment is appropriate only where the designated evidentiary matter shows the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Warner Trucking, Inc. v. Carolina Cas. Ins. Co.*, 686 N.E.2d 102, 104 (Ind. 1997). We must determine whether there is a genuine issue of material fact and whether the trial court correctly applied the law. *Southport Little League v. Vaughan*, 734 N.E.2d 261, 269 (Ind.Ct. App.2000), *trans. denied.*

> A party opposing summary judgment is not required to come forward with contrary evidence until the moving party demonstrates the absence of a genuine issue of material fact. On appellate review, we construe the pleadings, affidavits, and designated materials in a light most favorable to the non-movant. When there are material disputed facts, or if undisputed facts give rise to conflicting reasonable inferences that affect the outcome, they must be resolved in favor of the non-movant.

*Warner*, 686 N.E.2d at 104 (citations omitted).

#### *I. Respondeat Superior*

Respondeat superior is the applicable tort theory of vicarious liability and creates liability for a principal where it would otherwise not exist. *Southport Little League*, 734 N.E.2d at 268. Under this doctrine, "an employer is liable for the acts of its employees which were committed within the course and scope of their employment." *City of Fort Wayne v. Moore*, 706 N.E.2d 604, 607 (Ind.Ct.App.1999), *trans. denied.*

In order to be within the scope of employment the employee must be in the service of the employer. Acts for which the employer is not responsible are those done on the employee's own initiative, with no intention to perform it as part of or incident to the service for which he is employed. However, an employee's wrongful act may still fall within the scope of employment if his purpose was, to an appreciable extent, to further his employer's business, even if the act was predominantly motivated by an intention to benefit the employee himself.

*Stropes by Taylor v. Heritage House Childrens Ctr. of Shelbyville, Inc.,* 547 N.E.2d 244, 247 (Ind.1989) (citations and internal quotations omitted).

In *Stropes*, nurse's aide Robert Griffin ("Griffin") sexually assaulted a fourteen-year-old welfare department ward and full-time Heritage House resident suffering from cerebral palsy and severe mental retardation. The *Stropes* court noted that

Heritage's employee [Griffin] committed some acts unquestionably within the scope of his employment. Griffin began the episode by performing a fully authorized act, stripping the sheets from [Stropes's] bed prior to changing the bedding. He was also authorized to undress David Stropes and to touch his genitals and other parts of his body when bathing him and changing his clothes. [Griffin then got into bed with Stropes and performed oral and anal sex upon him.] Griffin also ended the episode with a fully authorized act, dressing David for the day. [I]t is beyond question that the abuse David suffered at Griffin's hands was unauthorized by Heritage and committed for Griffin's own gratification.

The fact that this was a sexual assault is not per se determinative of the scope of employment question. A blanket rule holding all sexual attacks outside the scope of employment as a matter of law because they satisfy the perpetrators' personal desires would draw an unprincipled distinction between such assaults and other types of crimes which employees may commit in response to other personal motivations, such as anger or financial pressures. Rather, the nature of the wrongful act should be a consideration in the assessment of whether and to what extent Griffin's acts fell within the scope of his employment such that Heritage should be held accountable.

Rape and sexual abuse constitute arguably the most egregious instances of wrongful acts which an employee could commit on the job and lend themselves to arguably the most instinctive conclusion that such acts could never be within the scope of one's employment, yet other courts have recognized that the resolution of the question does not turn on the type of act committed or on the perpetrator's emotional baggage accompanying the attack.

*Id.* at 249. The *Stropes* court then briefly examined two cases standing for the proposition that "the focus must be on how the employment relates to the context in which the commission of the wrongful act arose." *Id.* at 249 (discussing *Marston v. Minneapolis Clinic of Psychiatry,* 329 N.W.2d 306, 311 (Minn.1982), *Lyon v. Carey,* 533 F.2d 649, 654–55 (D.C.Cir.1976)). The court continued,

A jury presented with the facts of this case might find that Robert Griffin acted to an appreciable extent to further his master's business, that his actions were, at least for a time, authorized by his employer, related to the service for which he was employed, and motivated to an extent by [his employer's] interests, and that, therefore, his wrongful

acts fell within the scope of his employment and Heritage should be accountable. Conversely, a jury might find that Griffin's acts were so divorced in time, place and purpose from his employment duties as to preclude the imposition of liability on his employer. The nature of the acts [was], at the very least, sufficiently associated with Griffin's authorized duties to escape dismissal on summary judgment.

*Id.* at 250 (initial alteration in original) (citations and internal quotations omitted).

Here, Interim contends that since Baral's duties were restricted to feeding, bathing, and changing Kimberly, and that since she was neither expected nor authorized to administer medication to Kimberly, Baral's authorized acts were "sufficiently different from administering medication or injecting insulin" as to preclude Interim's liability under respondeat superior. We see no substantive distinction, however, between Baral's alleged criminal act and Griffin's criminal act in *Stropes,* both of which were committed in the midst of otherwise authorized duties.

Interim seeks to invite comparison with *Konkle v. Henson,* 672 N.E.2d 450 (Ind.Ct. App.1996), where a panel of this court affirmed summary judgment in favor of a minister who molested a minor parishioner, oftentimes while in the church building itself.[1] However, the *Konkle* court noted that there was

no evidence that at the time Henson molested Konkle he was engaging in authorized acts. Konkle testified that on one occasion, Henson gave her a bible to read as he began to attempt to engage in intercourse with her. However, there is no showing that he was teaching Konkle or performing any other pastoral acts at the time. The unauthorized acts committed by Henson are not similar to his duties as a minister. Henson may have had access to Konkle because of his position as pastor, but he was not engaging in authorized acts or serving the interests of his employer at the time he molested Konkle.

*Id.* at 457. Interim repeatedly claims that Baral was authorized to perform nothing more than basic "babysitting" duties while caring for Kimberly, but the fact remains that Baral was in the course of performing these duties when she allegedly injected Kimberly with insulin. Thus, as our supreme court held in *Stropes,* a jury must decide whether Baral's act was so "divorced in time, place and purpose" from her employment duties as to allow Interim to avoid liability. *See also Southport Little League,* 734 N.E.2d at 270 (Little League equipment manager molested two baseball players; denial of summary judgment affirmed "[b]ecause the [plaintiffs'] designated materials raise[d] the inference that some of [the equipment manager's] acts were authorized (such as fitting the youths' uniforms) when he viewed [the youths'] genitalia for his sexual gratification and when he sexually molested the youths"). Accordingly, we affirm the trial court's denial of summary judgment on this issue.

## II. Non–Delegable Duty

 "The duty to exercise care for the safety of another arises as a matter of law out of some relation existing between the parties, and it is the province of the court to determine whether such a relation gives rise to such duty." *Stropes,* 547 N.E.2d at 253 (internal quotation marks omitted). The *Stropes* court addressed

---

1. As the *Konkle* court noted, "simply because an act could not have occurred without access to the employer's facilities does not bring it within the scope of employment." 672 N.E.2d at 457.

the issue of a non-delegable duty as follows:

> First, once one has, by contract or otherwise, assumed the duty to protect another, the nature of that duty may be such that the responsibility for providing the protection cannot be delegated even though the protective tasks themselves are.... Second, where an employer has assumed a non-delegable duty to protect a person and his employee inflicts injury on that person, the doctrine of respondeat superior will not interdict the imposition of liability on the employer even if the wrongful act was outside the scope of employment.

*Id.* at 250–51.

> Under respondeat superior, employer liability is coextensive with the powers and advantages engendered by the employment relationship. Because liability is predicated conceptually on the employer's ability to command or control his employee's acts, an employer can be held responsible only for those acts of his employee which are committed within the scope of their employment relationship. Under the common carrier exception to respondeat superior, however, the range of employee activities deemed to be under the employer's dominion is irrelevant. Liability is predicated on the passenger's surrender and the carrier's assumption of the responsibility for the passenger's safety, the ability to control his environment, and his personal autonomy in terms of protecting himself from harm; therefore, the employer can be held responsible for any violation by its employee of the carrier's non-delegable duty to protect the passenger, regardless of whether the act is within the scope of employment.

*Id.* at 253.

The *Stropes* court justified its extension of the common carrier exception to the facts before it as follows:

> When Heritage accepted David as a resident of its facility, it was fully cognizant of the disabilities and infirmities he suffered which rendered him unable to care for himself and which, in fact, undoubtedly formed the basis of their relationship. Their "contract of passage" contemplated that the entire responsibility for David's comfort, safety and maintenance would be on Heritage and that the performance of these tasks would be delegated to its employees. Given the degree of David's lack of autonomy and his dependence on Heritage for care and the degree of Heritage's control over David and the circumstances in which he found himself, we find that Heritage assumed a non-delegable duty to provide protection and care so as to fall within the common carrier exception. The standard of care which Heritage owed to David, therefore, was that actual care be used by Heritage and its employees to provide that protection. The trial court was in error to summarily reject his claim that such a duty existed.

*Id.* at 253–54. Here, Interim argues that neither it nor Baral assumed "the type of control and responsibility for the patient that was assumed" in *Stropes*. Specifically, Interim asserts it "never contracted for, nor agreed to assume, the entire responsibility for Kimberly's comfort and safety." Rather, "Interim's role in providing home health aides was merely to assist Kimberly with personal care activities." Interim again observes that Baral was responsible for nothing more than "babysitting" duties in caring for Kimberly while Karen "slept upstairs in the same house."

Nevertheless, given the severity of Kimberly's disabilities and infirmities (which undoubtedly formed the basis of the Moyers' relationship with Interim), the degree

of Kimberly's dependence on Baral for her care, and the degree of Baral's control over Kimberly while in the Moyers' home, we conclude that Interim assumed a non-delegable duty to provide for Kimberly's care and safety. We are unpersuaded by Interim's argument that Interim was not responsible for Kimberly's around-the-clock care or medication and that Karen remained upstairs during Baral's visits. Kimberly was unable to provide for even her most basic needs or protect herself from harm and was thus entirely dependent on Interim's employees for her care and safety. The trial court properly denied Interim's motion for summary judgment on this issue.

### III. Negligent Hiring and Retention

■ Finally, Interim contends that the trial court erred in denying its motion for summary judgment on this issue [2] because its investigation of Baral's criminal and employment background revealed no history of misconduct. On her employment application, Baral listed Becky Shank ("Shank") and Regina Gordon ("Gordon") as professional references.[3] In a letter dated August 7, 1995, Shank stated that she had known Baral for "a little over a year both in a personal and professional capacity" and that Baral had completed an internship at St. Francis College under her supervision. Shank described Baral as "responsible, honest, and hardworking" and noted that she "showed a genuine concern for the residents under her care, and did her best to see that she met those residents['] needs[.]" In a letter dated August 7, 1995, Gordon stated that she had known Baral for three years and that Baral had worked in social services and as a volunteer during a Salvation Army internship. Gordon stated that Baral was "very kind and friendly" and "quick to grasp new information," "carried out all instructions given her and did her work faithfully and enthusiastically," and "always went above and beyond the call of duty."

Notwithstanding these positive references, we conclude that there remains a genuine issue of material fact with respect to Interim's negligent hiring and retention of Baral. Viewing the evidence most favorable to the Moyers as the non-moving party, there is no indication that Interim contacted Tammie Logsdon, the supervisor listed for Baral's most recent employer, Your Friends and Neighbors, where she worked as a residential manager from March 1994 to July 1995. Moreover, the record does not conclusively establish that Interim contacted Baral's supervisors from the three remaining previous employers listed on her application form. In an affidavit, Interim vice president of operations Jon Canfield ("Canfield") stated that Interim "contacted Baral's previous employers and reviewed her professional references,"[4] but there is no record of the previous employers' assessment of Baral.

2. We note that Interim's summary judgment motion addressed only the Moyers' claims for negligent hiring and retention and did not specifically address the claim of negligent training alleged in the Moyers' complaint.

3. Interim's employment application form requests the applicant to list as professional references the names of two licensed nurses "[e]xcluding former employers or relatives." There is no indication that either Shank or Gordon is a licensed nurse.

4. Canfield's affidavit suggests that Shank was Baral's employer at Your Friends and Neighbors, but the record does not indicate whether Shank was associated with this entity or whether Baral was employed with this entity as part of her internship with St. Francis College, from which she graduated in May 1995.

The extent of Interim's duty to inquire [5] and whether Interim breached this duty are questions for a jury to determine. *See Kinsey v. Bray,* 596 N.E.2d 938, 944 (Ind. Ct.App.1992), *trans. denied; see also Ashland Pipeline Co. v. Indiana Bell Tel. Co.,* 505 N.E.2d 483, 488 (Ind.Ct.App.1987) ("The question then arises whether the person charged with the duty to inquire had knowledge or means of knowledge of which he did not avail himself, so that knowledge must be implied; such is a question of fact for the trier thereof."), *trans. denied; Levinson v. Citizens Nat'l Bank of Evansville,* 644 N.E.2d 1264, 1269 (Ind.Ct.App.1994) (recognizing cause of action for negligent hiring and retention of employee; "In order to prevail on this theory, the plaintiff must show that the defendant employer negligently retained an employee who the defendant knew was in the habit of misconducting himself."), *trans. denied; Tindall v. Enderle,* 162 Ind. App. 524, 526, 320 N.E.2d 764, 766 (1974) ("However, evidence of prior similar actions committed by an employee are often admissible to establish the employer's actual or constructive knowledge of the employee's propensity to commit a later act of negligence or violence as a basis for an action which asserts the negligent hiring or retention of such a person."), *trans. denied.* We therefore affirm the judgment of the trial court.[6]

Affirmed.

BARNES, J., concurs.

BAKER, J., concurs in result with separate opinion.

BAKER, Judge, concurring in result.

I concur with Parts I and II of the majority opinion, and I vote to affirm the trial court's denial of summary judgment on the claim of negligent hiring and retention. However, unlike the majority, I believe that Interim's motion for summary judgment produced evidence demonstrating an absence of a genuine issue of a material fact on at least one issue of the negligent hiring and retention claim—proximate cause. *See* maj. op., at 436 n. 6. Therefore, the Moyers were required to come forward with designated evidence demonstrating a genuine issue of material fact. Because they came forward with such designated evidence, their claim rightly survived summary judgment.

While acknowledging Baral's two positive professional references and an absence of criminal history, the majority concludes that Interim failed to demonstrate a genuine issue of material fact regarding the claim for negligent hiring and retention. In reaching its conclusion the majority reasons, "[T]here is no indication that Interim contacted Tammie Logsdon, the supervisor listed for Baral's most recent employer." Maj. op., at 435. The majority also finds support in that "the record does not conclusively establish that Interim contacted Baral's supervisors from the three remaining previous employers listed on her application form." *Id.*

However, assuming that Interim had a duty to call Baral's previous employers, the Barals were still required to come forward with evidence showing that these former employers would have revealed negative employment information. In my view, the logical extension of the majority's

---

**5.** We note that Interim does not dispute the existence of such a duty in this case.

**6.** Because we conclude that Interim failed to demonstrate the absence of a genuine issue of

material fact on this issue, we need not consider the evidence designated by the Moyers in response to Interim's summary judgment motion.

reasoning would allow claims for negligent hiring and retention to survive summary judgment whenever a defendant failed to show that it spoke to an employee's former employers. In other words, the claim would survive summary judgment even if the former employers ultimately would not have given information showing an employee's propensity to commit criminal acts or misconduct.

Here, Interim's Vice President of Operations stated that the company had contacted Baral's previous employers and reviewed her professional references. He also declared, "There was nothing in Baral's history to indicate a habit of misconduct or a propensity to commit an intentional criminal act." These statements necessarily demonstrate a lack of a genuine issue of material fact on proximate causation. Put differently, if there was nothing in Baral's history to put Interim on notice of her propensity for misconduct or committing criminal acts, then Interim could not have proximately caused the Moyers' injuries. Accordingly, the Moyers were required to come forward with contrary evidence about whether Interim's purported failure to call certain recent employers led to the Moyers' injuries. *See Warner Trucking, Inc. v. Carolina Cas. Ins. Co.*, 686 N.E.2d 102, 104 (Ind.1997). The Moyers did so by including two affidavits from employees of Your Friends and Neighbors, Inc., Baral's most recent employer. These former co-workers recounted several unusual incidents, including two deaths, involving Baral's care of patients. For instance, one individual with autism, having no history of seizures, suffered a seizure under Baral's sole care and later stated to the Baral's co-worker, "Michele not hit me so hard."

Though the Moyers came forward with designated evidence creating a genuine issue of material fact on each element of the negligent hiring and retention claim, the majority does not require this production of contrary designated evidence from the Moyers. Rather, the majority concludes that Interim failed to demonstrate a genuine issue of material fact on each element of the Moyers' claim of negligent hiring and retention—a conclusion I disagree with. In effect, the majority has found a duty and breach of that duty; but, without the Moyers' evidentiary designations, there is no contrary evidence that such breach proximately caused the Moyers' injuries. So without requiring contrary designated evidence from the Moyers, then under these circumstances the majority has dispensed with the element of proximate cause in the tort of negligent hiring and retention. In the end, the Moyers' designated material was sufficient to demonstrate a genuine issue of material fact on proximate cause.